OPINION OF THE COURT
Memorandum.
The order of the Appellate Division should be reversed, the conviction vacated and the indictment dismissed.
Defendant was accused of killing Frank Cirillo during the early morning of Sunday, March 7,1982. He was convicted, after a jury trial, of manslaughter in the first degree, and a divided Appellate Division affirmed. On appeal, defendant contends that the evidence adduced at trial, which was entirely circumstantial, was insufficient to establish his guilt beyond a reasonable doubt.
The well-settled standard of proof in circumstantial evidence cases is that the facts from which the inference of defendant’s guilt is drawn must be inconsistent with the defendant’s innocence and must exclude to a moral certainty every other reason *768 able hypothesis (People v Sanchez, 61 NY2d 1022,1024; People v Way, 59 NY2d 361, 365; People v Bearden, 290 NY 478, 480). Viewing the evidence in the light most favorable to the prosecution, and giving it the benefit of every reasonable inference to be drawn therefrom, this court must now determine whether the jury reasonably concluded that the prosecution met this standard. Application of these principles minimizes “a danger legitimately associated with circumstantial evidence — that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree” (People v Benzinger, 36 NY2d 29, 32; accord, People v Kennedy, 47 NY2d 196, 202; People v Cleague, 22 NY2d 363, 367).
Here, the inferences that could be drawn from the evidence are consistent with innocence as well as guilt, and there are logical gaps in the People’s case that cannot be bridged by the drawing of reasonable, permissible inferences from the evidence. Accordingly, we conclude that the jury’s verdict was not supported by sufficient evidence.
The People’s case was built around four episodes summarized below: events at the Park Tavern the night of the murder; defendant’s contacts with a derringer; a conversation at the Spirits Pub two days after the murder; and an exchange between defendant and his father at the station house.
THE PARK TAVERN
Defendant arrived at the Park Tavern, on Morris Park Avenue in The Bronx, late in the evening of Saturday, March 6, 1982, accompanied by his friend of several years, Joseph Olivieri. Olivieri’s wife, Debra, arrived at the Tavern at about 11 p.m. Debra had been shopping with Frank Cirillo, with whom she had had a relationship while Olivieri was in jail for robbery. Frank Petrucci then came into the Tavern with Eddie Cullen. Cullen told Debra that Cirillo, who had driven Cullen and Petrucci to the Tavern at his suggestion, was outside in the car and wanted to speak with her. Debra, seated at the bar with her husband and the defendant, refused.
Some time later, another patron, John Bardino, asked the bartender, Ralph Mazzella, for a rag, stating that someone had been hurt outside. Mazzella testified that at that moment he did not see defendant at the bar, although defendant could have been anywhere inside the crowded, noisy Tavern. Bardino soon returned, announced that someone had been shot, and asked that an ambulance be called. Mazzella testified that Olivieri asked defendant, “What the fuck did you do?” Mazzella heard no *769 more of this conversation, and did not know to what Olivieri’s question related. While Olivieri was at the telephone calling an ambulance, he heard someone say “I shot him,” and he further testified that “it might have been the voice of Joe Giuliano.” Petrucci, too, heard someone say, “I shot him, I think he is dead,” but had no idea who made the statement. Similarly, Cullen heard a voice state “I shot the kid.” At trial, Cullen testified repeatedly that he did not recognize the voice or see the declarant, although he had expressed the view in his testimony before the Grand Jury, read into the trial record for impeachment purposes, that he believed the statement had been made by defendant. After the shooting defendant remained in the Tavern for at least 45 minutes. The next day, Olivieri asked defendant, “Joey, what happened last night?” Defendant, according to Olivieri, replied, “I don’t want to talk about it because I been pretty high and I didn’t know exactly what had happened.”
THE DERRINGER
Cirillo was shot behind the left ear with a single .22 caliber bullet. He was found seated behind the steering wheel of his station wagon, his head slumped forward. His window was open some 3 to 4 inches. No powder burns were found on the body or the car. No shell casings were found, and no murder weapon was recovered. Olivieri testified that about a week before the crime, he and Cullen were present as defendant adjusted the barrel of a .22 caliber antique derringer and returned it to its owner, Cirillo. Cullen, by contrast, testified that he had sold the derringer to Cirillo, reacquired it, and then sold the gun to defendant after he adjusted the barrel about a month before the crime.
The People’s ballistics expert, Detective Steven Colangelo, testified that the fatal bullet could have been fired by a .22 caliber rifle, semiautomatic pistol or a derringer — a range including hundreds of thousands of guns. According to Colangelo, a derringer is by nature a “closeup gun” or “defensive type weapon,” very inaccurate and of little use at distances greater than 10 yards. From the absence of powder burns at the crime scene, Colangelo deduced that the weapon had been fired at a distance of at least 18 to 24 inches.
THE SPIRITS PUB
Two days after Cirillo’s death, on Tuesday, March 9, 1982, Patricia Salargo was at the Spirits Pub when two men, neither of whom she had seen before, entered. She spoke with one of them — a “John Travolta type” — to whom she was not really *770 paying that much attention. He sat next to her “at exactly the bar,” and “said that he had quit smoking and he was depressed about breaking up with his girl friend and about his future was planned and he didn’t feel so bad about breaking up with his fiancee as he did as having the boy she was out with done away with or blown away or I don’t exactly know the end of this.” (There was no evidence that defendant had a fianceé.) Salargo did not identify defendant as the man who had made these statements to her. She testified, however, that of all the people she had spoken with that night, the man with whom she had the conversation at the bar was the only person she had never met before.
Salvatore Avila was also at the Spirits Pub that night, having arrived at about 3:30 p.m. At about 8:00 p.m., after consuming nine beers, he saw two strangers walk into the Pub. Avila testified that he spoke with one of them, identified as defendant, for 20 to 30 minutes. Avila knew Salargo, and noted that most or all of the patrons at the Spirits Pub spoke with her during the evening. He testified that he observed Salargo in conversation with one of the two strangers at the cigarette machine, but Avila did not know which of the two it was.
Eight witnesses, friends and family of defendant, testified that defendant was at home with them the evening of March 9.
THE STATION HOUSE
Defendant was taken into custody on April 13, 1982, and was visited at the station house by his father. Two police officers testified that they overheard defendant say to his father, “If I ever find out who ratted me out, I will kill the guy,” to which his father responded, “That is what you are here for, because of your fucking temper.” Nearly eight months later, on the eve of trial, the two officers first advised other law enforcement personnel of this exchange. Defendant’s father, in his trial testimony, denied having had the conversation.
Based on these facts, we conclude that the conviction cannot stand. The inference of guilt is not the only one that can fairly and reasonably be drawn from the facts, and the evidence does not exclude beyond a reasonable doubt every reasonable hypothesis of innocence.
The evidence regarding the events at the Park Tavern is at best equivocal. Although the bartender testified that he did not see defendant when Bardino entered the Tavern asking for a rag, he acknowledged that defendant could have been anywhere else in the Tavern. Olivieri’s question to defendant, overheard *771 by the bartender shortly after the announcement that someone had been shot, is susceptible of numerous interpretations. It would be speculative to infer from this testimony, unaccompanied by any evidence of the context in which the question was asked, that Olivieri believed defendant was responsible for Cirillo’s shooting (if indeed Olivieri’s belief had probative value). The People attach significance to an unidentified patron’s statement, overheard by Olivieri, Cullen and Petrucci, that he had shot Cirillo, but none of the witnesses could identify with any degree of certainty the person who spoke those words.
Similarly, any inference drawn from the evidence regarding the derringer would be speculative, particularly in light of the testimony that the fatal bullet could have been fired from any of hundreds of thousands of guns. A conclusion that a derringer was used would, moreover, be at variance with the testimony regarding the inherent inaccuracy of derringers and the absence of powder burns on the body, indicating that the murder weapon had been fired from a distance.
Nor do the events in the Spirits Pub point unequivocally to defendant’s guilt. Salargo testified that an unidentified stranger sat beside her at the bar and confessed to a murder. Avila testified that he saw Salargo speaking with one of two strangers at the cigarette machine. No one placed defendant at the bar, and no one identified defendant as having spoken to Salargo even at the cigarette machine.
Finally, defendant’s conversation with his father in the station house does not support the conviction. Defendant’s statement that he would kill the person “who ratted [him] out” could as readily be a threat to seek vengeance against the person responsible for his arrest as an acknowledgement that he had murdered Cirillo. Any statement of defendant’s father that it was defendant’s temper that landed him in jail hardly points to guilt, particularly where there is no evidence of an incident or motive which might have provoked an outburst of temper.
To convict defendant of having killed Frank Cirillo on this record, a trier of fact would have had to engage in speculation, draw unwarranted conclusions based on probabilities of low degree, and leap logical gaps in the evidence. We conclude that no rational trier of fact could have found that elements of the crime were established beyond a reasonable doubt, and therefore reverse the order of the Appellate Division, vacate the conviction and dismiss the indictment.
*772 Chief Judge Wachtler and Judges Jasen, Meyer, Simons, Kaye and Alexander concur in memorandum; Judge Titone taking no part.
Order reversed, etc.